# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SURTECO NORTH AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N25C-10-178 KMM |
| | ) | CCLD |
| AIG SPECIALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Date Submitted: April 21, 2026
Date Decided: July 6, 2026

*Defendant's Motion to Dismiss –* **GRANTED**, in part, **DENIED**, in part.

## MEMORANDUM OPINION AND ORDER

Jennifer C. Wasson, Ryan D. Kingshill, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Amanda M. Leffler (argued), SHUMAKER, LOOP & KENDRICK, LLP, Akron, Ohio; Meagan R. Cyrus, SHUMAKER, LOOP & KENDRICK, LLP, Columbus, Ohio, *Attorneys for Plaintiff*.

John L. Reed, Ronald N. Brown, III, Daniel P. Klusman, DLA PIPER LLP (US), Wilmington, Delaware; Megan Shea Harwick (argued), DLA PIPER LLP (US), New York, New York; Robert A. Donoghue, DLA PIPER LLP (US), Boston, Massachusetts, *Attorneys for Defendant*.

**Miller, J.**

# I.    INTRODUCTION

Plaintiff Surteco North America, Inc. ("Surteco") acquired a business and in connection therewith, the business made numerous representations. To protect itself against breaches of those representations, Surteco purchased a buyer-side representations and warranties insurance policy from AIG Specialty Insurance Company ("AIG").

After the transaction closed, Surteco notified AIG of its claim for breach of three representations—the material adverse effect, top customer, and ordinary course of business. Surteco filed the Complaint, asserting three counts of breach of contract (one for each of the three representations).

AIG moved to dismiss the Complaint under Rule 12(b)(6) ("the Motion"), contending that Surteco failed to adequately plead its claims. AIG is correct on two claims: Surteco's allegations fail to state a claim for breach of the material adverse effect (Count III) and the ordinary course representations (Count IV). As to the former, Surteco's allegations do not allege that a material adverse effect occurred during the relevant representation period. As to the ordinary course of business representation, Surteco does not allege that the acquired business deviated from its ordinary course—relying instead on the actions of a customer of the business. Accordingly, AIG's Motion as to Count III and Count IV is ***GRANTED***.[1]

---

[1] Surteco voluntarily dismissed Count I, which sought a declaratory judgment. D.I. 39.

Surteco, however, has adequately pled a breach of the top customer representation (Count II) based on the business receiving written notice from a top customer of its intent to limit its purchasing of the business' products, which it failed to disclose it during the relevant representation period. Accordingly, AIG's Motion as to Count II is ***DENIED***.

Surteco requests leave to amend. The court grants amendments liberally, provided the opposing party will not suffer serious prejudice. Here, AIG will not be prejudiced by an amendment. Surteco's request for leave to amend is ***GRANTED***.

## II.  FACTUAL BACKGROUND[2]

### A.  *Surteco's acquisition of Omnova*

Surteco sells decorative surface material products utilized in wood-based goods such as furniture and laminate flooring.[3] In August 2022, Surteco sought to acquire Omnova Solutions, Inc. ("Omnova"), a chemical company that produces wear-layer—a protective layer of polyvinyl chloride used in vinyl flooring products.[4] Acquiring Omnova presented an opportunity to both expand Surteco's business and increase its presence in North America.[5] That opportunity for growth

---

[2] The facts are derived from the Complaint. D.I. 1 ("Compl.") and the documents it incorporates by reference.

[3] Compl. ¶ 8.

[4] *Id.* ¶ 12 ("Wear-layer is the durable, protective translucent layer of polyvinyl chloride…in the vinyl flooring, which holds up to foot traffic.").

[5] *Id.* ¶¶ 13–14.

was primarily the result of a multi-year relationship between Omnova and its top-customer, Shaw Industries, Inc. ("Shaw").[6]

On December 13, 2022, Surteco and Omnova entered into a Sale and Purchase Agreement (the "SPA") for Omnova's wear-layer business (the "Omnova Acquisition").[7] Specifically, Surteco acquired "the laminates [and] performance films and coated fabrics businesses conducted by [Omnova]…as of the date hereof, consisting of the manufacturing, marketing, sale and distribution of the In-Scope Products…" (the "Business").[8]

During the acquisition process, Surteco received a due diligence report prepared for Omnova by McKinsey & Company.[9] The report outlined growth in Shaw's business but also identified the risk of customers, like Shaw, potentially producing their own wear-layer.[10]

**B.** ***Omnova's representations***

Under the SPA, Omnova made several representations and warranties regarding the Business. Three are relevant here (the "Omnova Representations").

Section 4.6(a) states, in part: "From June 30, 2022 to [December 13, 2022], there has not occurred a Business Material Adverse Effect[]" (the "MAE

---

[6] *Id.* ¶ 16.
[7] *Id.* ¶ 23; D.I. 20, Opening Brief ("OB"), Ex. 1 (SPA).
[8] SPA, Art. 1 at 3. In-Scope Products is defined to include polyvinyl chloride film used for wear-layer.
[9] Compl. ¶ 17.
[10] *Id.* ¶ 18.

3

representation").[11]  The SPA defines Business Material Adverse Effect as "an event, occurrence, fact, condition or change that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on…the business, results of operations, condition (financial or otherwise) or assets of the Business, taken as a whole[.]"[12]   The definition then excludes a number of events or occurrences, which are not relevant to this dispute.

Under Section 4.6(b), Omnova represented that it has conducted its business in the ordinary course, providing, in part: "[F]rom June 30, 2022 to [December 13, 2022], the Business has been conducted in the ordinary course of business consistent in all material respects with past practices…"[13] (the "Ordinary Course Representation").

Finally, Section 4.19 defines an Omnova "Top Customer" as "the ten (10) largest customers (by [d]ollar [v]alue) of the Business for the fiscal year ended December 31, 2021 and the nine (9) months ended September 30, 2022."[14]  Section 4.19 further states, in part:

> since January 9, 2022, no such…Top Customer has canceled or otherwise terminated, or [to the Seller's[15] knowledge][16] threatened to cancel or otherwise terminate its relationship with [Omnova]…. Except as set forth on Schedule 4.19, neither [Omnova] nor OMNOVA

---

[11] SPA § 4.6(a).
[12] *Id.* Art. 1 at 4.
[13] *Id.* § 4.6(b).
[14] *Id.* § 4.19.
[15] Seller is Omnova.
[16] This phrase was added by the AIG policy discussed below. AIG Policy § 1(g)(ix); SPA § 4.19.

Thailand[17] has received written notice that any such…Top Customer intends to cancel or otherwise materially and adversely limit its services, supplies or materials to them, or materially and adversely limit its usage or purchase of the services and products of them (either as a result of the transactions contemplated hereby or otherwise) (the "Top Customer Representation").[18]

Shaw was an Omnova Top Customer.[19]

## C.    *The AIG Policy*

In connection with the Omnova Acquisition, Surteco purchased a buyer-side representations and warranties insurance policy from AIG (the "AIG Policy").[20]  The AIG Policy covers Losses that result from a Breach of the SPA.[21]  The AIG Policy defines a "Breach" as "any breach of, or inaccuracy in, the representations and warranties set forth in [the SPA]…."[22]  A "Loss" is defined as "any losses, damages, liabilities, obligations, penalties, fines, charges, [t]axes, costs and expenses, suffered or paid by…[Surteco] to the extent arising out of or resulting from a Breach…."[23]

The AIG Policy contained a materiality scrape, which states:

For the purposes of determining whether a Breach of or inaccuracy in, the representations and warranties set forth in…the [SPA] has occurred, and the amount of Losses arising therefrom, any materiality, Business Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty shall be

---

[17] OMNOVA Thailand is an affiliate of Omnova and a private limited company organized under the laws of Thailand.  *Id.* at 1.
[18] *Id.* § 4.19.
[19] Compl. ¶ 29.
[20] *Id.* ¶ 30, Ex. A (the AIG Policy).
[21] AIG Policy § 2.
[22] *Id.* § 1(g)(i).
[23] *Id.* § 1(a).

disregarded, other than with respect to the representation in the [MAE Representation]…of the [SPA]….[24]

## D.    *Omnova and Shaw*

During the time Omnova solicited bids from potential buyers of the Business, its relationship with Shaw began to change.[25]  In November 2022, Omnova provided its September and October financials to Surteco.  The results were weak as compared to previous months, in large part because sales volume from Shaw had decreased. Specifically, an Omnova plant located in Jeannette, Pennsylvania (the primary servicer of Shaw's orders), began to see significant decreases in sales volume attributable to Shaw orders.[26]  Written correspondence from Shaw to Omnova at the time, "reflects that Shaw intended to decrease" and did decrease its purchasing of products from Omnova.[27]  Omnova did not report these written correspondences from Shaw to Surteco.  Rather, Omnova led Surteco to believe that any decline in sales at the Jeannette plant was the result of normal market fluctuations.[28]  And Omnova assured Surteco that Shaw sales were recovering well.[29]

Underpinning this was Omnova's knowledge that if Shaw "took the time" and "spent the money" it could create its own wear-layer, eliminating the need for

---

[24] *Id.* § 1(g) at 2.
[25] Compl. ¶ 37.
[26] *Id.* ¶ 37.
[27] *Id.*
[28] *Id.* ¶ 41.
[29] *Id.* ¶ 22.

Omnova's product.[30]   Omnova knew Shaw engaged an operations management consultant known to be an expert in the type of machinery used to manufacture wear-layer.[31] Further, in a departure from its typical practice, Shaw prohibited Omnova from visiting its plant.   This was despite issues with Shaw's machinery and manufacturing lines where Shaw routinely relied on the experience and advice of Omnova employees.[32]

Shaw continued to reshape its relationship with Omnova, its sole supplier of wear-layer.[33]   And therefore, without Omnova's product, Shaw's production capabilities would be significantly limited.[34]   Yet, in late 2022, with the Master Service Agreement (the "Service Agreement") between Shaw and Omnova set to expire on April 1, 2023, Shaw refused to negotiate a renewal—a departure from previous negotiations between the parties.[35]   Shaw advised Omnova that any potential renewal would be on different terms—a single year renewal instead of the previous three-year renewal period.[36]   And as the expiration of the Service Agreement continued to grow closer, Shaw informed Omnova that it was unsure

---

[30] *Id.* ¶ 42.
[31] *Id.* ¶ 43.
[32] *Id.* ¶ 44.
[33] *Id.* ¶ 50.
[34] *Id.* ¶ 50.
[35] *Id.* ¶¶ 47–48.
[36] *Id.* ¶ 48.

when it could even review the proposed renewal of the Service Agreement.[37] Omnova did not inform Surteco of Shaw's renewal hesitations.[38]

On March 1, 2023—a day after the Omnova Acquisition closed—a former Shaw employee informed Omnova of Shaw's intentions to start manufacturing in-house products supplied by Omnova.[39] On April 17, 2023, a Shaw representative confirmed what the former employee had reported: Shaw no longer needed Omnova's products.[40] Weeks later, Shaw memorialized the termination of its relationship with Omnova in a termination letter.[41]

### E. *Surteco seeks coverage for a Loss under the AIG Policy.*

Surteco notified AIG of a claim for breaches of the Omnova Representations (the "Claim").[42] Thereafter, AIG investigated the Claim and subsequently denied coverage.[43] After AIG's denial, the parties participated in mediation that ultimately proved unsuccessful.[44] This litigation followed.

---

[37] *Id.* ¶ 49.
[38] *Id.* ¶ 50.
[39] *Id.* ¶ 51.
[40] *Id.* ¶ 52.
[41] *Id.* ¶ 53.
[42] *Id.* ¶ 56.
[43] *Id.* ¶¶ 59–60.
[44] *Id.* ¶ 63.

## III.   PARTIES' CONTENTIONS

AIG contends that Surteco has failed to plead facts that support a claim for breach of contract as to each of the Omnova Representations and, accordingly, that support a breach of the AIG Policy.[45]

Surteco argues that it has adequately alleged breaches of the Omnova Representations sufficient to satisfy Delaware's minimal pleading standards.[46]

## IV.   STANDARD OF REVIEW

On a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6), "the governing pleading standard is…reasonable conceivability."[47]   Accordingly, the court must "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[48]   When considering a motion under Rule 12(b)(6), the court "must accept all well-pleaded factual allegations in the [c]omplaint as true, accept even vague allegations…as 'well-pleaded' if they provide defendant notice of the claims, [and] draw all reasonable inferences in favor of the plaintiff[.]"[49]   "[U]nder Delaware's judicial system of notice pleading, a plaintiff need not plead evidence.  Rather, the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted."[50]

---

[45] OB at 16–26.
[46] *See generally* D.I. 40 (Answering Brief ("AB")).
[47] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 537 (Del. 2011).
[48] *Id.* at 536.
[49] *Id.* at 537.
[50] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

9

The court, however, does not accept "conclusory allegations unsupported by specific facts," or "draw unreasonable inferences in the plaintiff's favor."[51]

## V.  ANALYSIS

### A.  *Breach of contract claims*

To state a claim for breach of contract a plaintiff must allege: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) damages resulting from that breach.[52]

Surteco brings three counts for breach of contract, one for each alleged breach of the Omnova Representations.  AIG argues that Surteco failed to satisfy its pleading requirement because Surteco's allegations do not assert a reasonably conceivable breach of the Omnova Representations.  The Court addresses each in turn.

#### 1.  *Surteco has not adequately alleged a breach of the MAE Representation.*

In Section 4.6(a) of the SPA, Omnova represented from June 30, 2022 to December 13, 2022, that "there has not occurred a Business Material Adverse Effect."[53]  Thus, Omnova warranted that no "event, occurrence, fact, condition or change that, or would be reasonably be expected to have, individually or in the

---

[51] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citation omitted).
[52] *VLIW Tech.,* 840 A.2d at 612.
[53] SPA § 4.6(a).

10

aggregate, a material adverse effect on…the business, results of operations, conditions (financial or otherwise) or assets of the Business, taken as a whole" had occurred.[54]

"Under Delaware law, 'a buyer faces a heavy burden when it attempts to invoke a material adverse effect clause.'"[55] Generally, a material adverse effect "is an unexpected event or series of events that threatens a business's overall earnings 'in a durationally-significant manner.'"[56] Accordingly, a "short-term hiccup in earnings" does not suffice. Rather, an adverse effect must be material when "viewed from the long[]-term perspective of a reasonable acquirer."[57]

Here, the MAE Representation is a backward-looking representation: Omnova represented that a Business Material Adverse Effect had not occurred. The MAE Representation did not include a representation regarding facts known about such an event possibly occurring in the future. Thus, the focus must be on the approximately six month period ending December 13, 2022.

Surteco asserts that Omnova was "aware[]" of Shaw's decision to move production of wear-layer in-house and limit or terminate its relationship with Omnova during the MAE Representation period.[58] For support, Surteco points to

[54] *Id.* Art. 1 at 4.
[55] *3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *11 (Del. Super. June 18, 2019) (quoting *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) (cleaned up)).
[56] *Id.*
[57] *Hexion Specialty Chemicals, Inc.*, 965 A.2d at 738.
[58] AB at 25–26.

11

Shaw's decline in purchasing, the resulting decrease of production at the Jeanette plant, Omnova's lock-out from Shaw's plant, Shaw's retention of an expert, and Shaw's conduct during negotiations of the Service Agreement.[59] And it argues that, in the aggregate and given the proximity between the closing date and Shaw's termination (approximately seven weeks after closing),[60] the Court should infer that Omnova had knowledge of Shaw's decision to terminate its relationship during the MAE Representation period. Surteco argues that this is a fact intensive analysis, which makes dismissal inappropriate, and relies on *3M Co. v. Neology,[61] Inc.* in support.

Surteco's arguments are unpersuasive. Its allegations do not support a reasonable inference that during the MAE Representation period "an event, occurrence, fact, condition, or change" had occurred. Omnova's "awareness" that Shaw may take production of wear-layer in-house or outright terminate the relationship sometime in the future is insufficient. Omnova was not required to speculate about Shaw's future intentions. And, that the relationship was terminated seven weeks after closing does nothing to bolster Surteco's allegations relating to

---

[59] *Id.* at 26.
[60] The transaction closed on February 28, 2023 and the termination letter was received on April 26, 2023. Compl. ¶¶ 24, 53.
[61] 2019 WL 2714832 (Del. Super. June 28, 2019).

the MAE Representation period, which ended approximately four months before Omnova received the termination notice.

Further, *3M* is factually distinguishable. There, the Asset Purchase Agreement contained a Material Adverse Effect provision similar to the SPA.[62] The counterclaim plaintiff alleged that 3M knew during the representation period of an overheating issue with the product. The counterclaim plaintiff pointed to an internal 3M report, issued in the representation period, that showed it knew of the problem, its attempts to resolve it were unsuccessful, and it had no plans for future development.[63] Based on these allegations, the court ruled that it was reasonable to infer that 3M knew "an entire product line, which represented a substantial portion of the Business, was in jeopardy"[64] and accordingly, the counterclaim plaintiff's allegations were sufficient to state a claim for breach of the Material Adverse Effect provision. Unlike *3M*, Surteco pointed to nothing other than an "awareness" during the MAE Representation period that Shaw may take actions sometime in the future.

Accordingly, AIG's Motion as to Count III is GRANTED.

---

[62] The Asset Purchase Agreement defined Material Adverse Effect as: "[A]ny state of facts, circumstance, condition, event, change, development, occurrence or effect (each, an "Effect") that is materially adverse to (a) the business, condition (financial or otherwise), assets, liabilities, operations or results of operations of the Business, taken as a whole…" *3M*, 2019 WL 2714832, at *1.

[63] *3M*, 2019 WL 2714832, at *12.

[64] *Id.*

**2.  *Surteco has not adequately alleged a breach of the Ordinary Course Representation.***

The Ordinary Course Representation, with the AIG Policy's materiality scrape, provides that "from June 30, 2022 to [December 13, 2022] the Business has been conducted in the ordinary course of business consistent in all ~~material~~ respects with past practice…."[65]

An ordinary course[66] covenant is utilized to "help ensure that the business the buyer is paying for at closing is essentially the same as the one it" earlier decided to buy.[67]  Such a covenant "prevents *sellers from taking any actions* that materially change the nature or quality of the business that is being purchased, whether or not those changes were related to misconduct."[68]  And when "an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase, the court evaluates"[69] only "how the company has operated in the past, both generally and under similar circumstances."[70]  Ultimately, "it is the facts—and the specific

---

[65] SPA § 4.6(b).

[66] Applying dictionary definitions, when "ordinary" is used in conjunction with "course of business," "Delaware courts have interpreted 'ordinary course' as '[t]he normal and ordinary routine of conducting business.'" *AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC*, 268 A.3d 198, 210 (Del. 2021) (citing *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014)).

[67] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *83 (Del. Ch. Oct 1, 2018) (cleaned up).

[68] *AB Stable VIII LLC*, 268 A.3d at 211 (emphasis added).

[69] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *24 (Del. Ch. Mar. 1, 2022) (quoting *Snow Phipps Group, LLC v. KCAKE Acquisition, Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021)).

[70] *Level 4 Yoga, LLC*, 2022 WL 601862, at *24 (quoting *AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC*, 2020 WL 7024929, at *70 (Del. Ch. Nov. 30, 2020)).

language of the contract's ordinary course covenant—that determine whether a seller has acted in the ordinary course of business."[71]  Accordingly, sustaining a claim of breach of the Ordinary Course Representation requires factual allegations that Omnova took actions that deviated from its "normal and ordinary routine of conducting business."[72]

Delaware decisions make clear that the seller's actions take center-stage when evaluating whether ordinary course representations were violated or are sufficiently pled.  Such claims have survived a motion to dismiss or were successful on the merits when, for example, sellers were alleged to have manipulated financial data in deviation from past accounting principles,[73] seller's employees schemed to start a competing business during the pendency of the acquisition, seller substantially restructured its business, and where seller stopped paying its suppliers even though such action may have been reasonable under the circumstances.[74]

Surteco argues that Omnova breached the Ordinary Course Representation because of deviations in its relationship with Shaw.  Surteco points to Shaw's lock-out of Omnova from Shaw's plant, Shaw's decision to no longer request Omnova to provide technical expertise on its production lines, the decrease in Shaw sales and

---

[71] *AB Stable VIII LLC*, 268 A.3d at 213.
[72] *Id.* at 210.
[73] *See Anschutz Corp.*, 2020 WL 3096744, at *11.
[74] *Id.* (collecting cases); *AB Stable VIII LLC*, 268 A.3d at 213-15.

the Jeanette plant's resulting downturn in production, and Shaw's hesitation to renew the Service Agreement, stating only that terms would be materially different than previous years.[75] Those allegations, however, do not implicate any action *taken by Omnova* that deviated from the ordinary course. Instead, they rely solely on Shaw's actions and they do not, on their own, state a claim of breach of the Ordinary Course Representation.[76] Accordingly, AIG's Motion as to Count IV is GRANTED.

### 3. *Surteco sufficiently alleged a breach of the Top Customer Representation.*

The Top Customer Representation, with the materiality scrape, states that Omnova has not "received a written notice that any such…Top Customer intends to cancel or otherwise ~~materially~~ and adversely modify its relationship with [Omnova] or…~~materially~~ and adversely limit its usage or purchase of the services and products of" Omnova.[77]

Surteco alleges that Omnova received "[w]ritten correspondence" from Shaw that "reflects that Shaw intended to decrease … its purchasing of products from Omnova."[78] And that Omnova ultimately "failed to report these communications" to Surteco. AIG argues that those allegations are insufficient to allege a breach of

---

[75] AB at 29–32.

[76] Surteco's sole allegation relating to actions by Omnova relate to purported plans to stage the Jeanette plant for potential buyers in order to create the appearance of busier plant. But Surteco's allegations do not suggest that the staging actually occurred.

[77] SPA § 4.19.

[78] Compl. ¶ 37.

16

the Top Customer Representation because they are devoid of any details about the alleged written correspondence, such as the date of the communications or the sender(s) and recipient(s).[79] But Surteco need not plead evidence.[80] To survive the motion it need only plead facts that, if true, would entitle it to recover under any reasonably conceivable set of circumstances.[81] While allegations of "written correspondence" that "reflects an intent to decrease purchasing" are vague, the Court must credit them as well-pled because Surteco's allegations are sufficient to put AIG on notice of the claim.[82] Therefore, Surteco has stated a claim for breach of the Top Customer Representation. AIG's Motion as to Count II is DENIED.

---

[79] OB at 17.

[80] Seeking to impose a particularity standard, AIG relies on *Eagle Enter. I v. Bricker*, 1985 WL 189280 (Del. Super. Sept. 24, 1985). *Bricker* involved a landlord-tenant dispute where the court dismissed defendants-tenants' counterclaim for failure to allege written notice to the landlord of specific deficiencies in the rental unit, as required by 25 *Del. C.* §§ 5306(a), 5307(a), and an omission of the amount of special damages claimed, as required by Superior Court Civil Rule 9(g). *Id.* at *2. The court ruled that the counterclaim contained a short and plain statement that put plaintiff on notice, but recognized that "fairness dictates" that the landlord be appraised of the particulars of the alleged deficiencies. Unlike in *Bricker*, there is no rule or statutory requirement to provide details of the claim. Surteco has alleged a written notice from Shaw of its intent to decrease purchasing Omnova products, although vaguely. This is sufficient and there is no "fairness" standard in the requirements of Superior Court Rule 8 or 12(b)(6). *See VLIW Tech., LLC*, 820 A.2d at 611 ("An allegation, though vague or lacking in detail, is nevertheless 'well-pleaded' if it puts the opposing party on notice of the claim being brought against it."). Thus, *Bricker* does not help AIG.

[81] *Cent. Mortg. Co.*, 27 A.3d at 536.

[82] Super. Ct. Civ. R. 12(b)(6).

17

**B.**     *Surteco's request to amend is granted*.

Surteco requests leave to amend pursuant to Superior Court Civil Rule 15(a).[83] Effective March 20, 2026, the Superior Court adopted new rules governing Complex Commercial Litigation Division cases.[84]  Among them is Rule 143(a)(5)(A), which states in relevant part, "[i]f a party wishes to amend the party's complaint in response to a motion to dismiss under Rule 12(b)(6), the party must amend the party's complaint – or seek leave to amend –…[b]efore the party's response to the motion is due," and upon a failure to do so, "unless the Court [finds] for good cause shown," a dismissal is with prejudice.  Surteco's Answering Brief was filed on February 11, 2026, and the Motion was fully briefed on March 18, 2026, during which Rule 15(a) still applied.  Although the new rules apply to all pending cases, here, in fairness to Surteco, which has not yet amended its complaint, the Court applies Rule 143(a)(2) (which incorporates the Rule 15(a) standard) to Surteco's request to amend.

"Leave to amend pleadings should be freely given unless there is evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, prejudice, futility, or the like."[85]   "The purpose of Rule [143(a)(2)] is to encourage the disposition of litigation on its merits."[86]  The court

---

[83] AB at 33.
[84] *See* Super. Ct. Civ. R. 141–146.
[85] *US Dominion, Inc. v. Newsmax Media, Inc.*, 2025 WL 1068257, at *1 (Del. Super. Apr. 9, 2025) (internal quotation marks and citation omitted).
[86] *Cordrey v. Doughty*, 2017 WL 4676593, at *3 (Del. Super. Oct. 11, 2017).

18

freely permits amendments to pleadings "unless the opposing party would be seriously prejudiced by the amendment."[87]  "A decision to permit or deny an amendment under Rule [143(a)(2)] is left to the discretion of the trial judge."[88]

Here, AIG did not address Surteco's request to amend.  Because leave shall be freely granted and finding no prejudice to AIG, Surteco's request to amend the Complaint is GRANTED.  Any amended pleading shall be filed within 20 days.

## VI.    CONCLUSION

AIG's Motion as to Count III and IV is GRANTED because Surteco failed to adequately allege facts that Omnova breached the MAE Representation or the Ordinary Course Representation.

The Motion is DENIED as to Count II because Surteco alleged facts sufficient to state a claim of breach of the Top Customer Representation.

Finally, Surteco's request to amend is GRANTED under Rule 143(a)(2).

**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge

---

[87] *Id.*
[88] *US Dominion, Inc.*, 2025 1068257, at *1.

19